UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 02-248(DWF)
Civil No. 05-805(DWF)

| | | |
|---|---|---|
| THERASE WARREN,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | ) | MEMORANDUM OF THE UNITED STATES IN OPPOSITION TO WARREN'S PETITION UNDER 28 U.S.C. § 2255 |

Petitioner Therase Warren was convicted after a jury trial in 2002 of distributing nine ounces of crack cocaine to a cooperating defendant. His conviction was affirmed on direct appeal. United States v. Warren, 03-1996 (8th Cir. May 17, 2004)(unpublished).

In his § 2255 petition, Warren claims that his trial counsel, Gary Bryant-Wolf, was ineffective for failing to challenge whether the drugs were crack, for failing to challenge Warren's criminal history, for failing to inform Warren of the government's sentencing enhancement information, for failing to present "exculpatory" evidence, and for failing to raise certain issues on appeal.

Warren also claims that during Warren's sentencing hearing, the prosecutor misstated the reasons why he dismissed an unrelated case against a different defendant. Warren does not explain how any such alleged misstatement has any bearing on Warren's conviction or sentence. Warren also seeks to raise a Booker claim. Finally, he contends that the federal drug laws do not apply to him.

As shown below, each of these allegations is without legal or factual merit. The petition should be summarily denied. No evidentiary hearing is warranted.

STATEMENT OF THE FACTS

This case arose out of an investigation of a drug dealer named Patrick Ester. In 1995, Ester was convicted in Federal District Court in Minnesota of conspiracy to distribute cocaine and crack cocaine. T. 316. He served a sentence of 50 months imprisonment and was still on supervised release at the time of the investigation in this case. T. 317. After his release from prison, Ester opened a store called New Life Clothing at 29th and Chicago in South Minneapolis. T. 315. Officers had information that Ester was dealing drugs out of New Life Clothing. T. 273, 281.

Petitioner Therase Warren has a lengthy criminal history including two prior felony drug convictions and a conviction for aggravated sexual assault involving a victim under the age of 13. T. 469, 471-72. Warren was released from prison in February 2002. T. 468, 474. He decided to move from Illinois to Minnesota to be with his boyhood friend Patrick Ester. T. 444. Upon arriving in Minnesota he had no job or other means of supporting himself. T. 376. He hooked up with Pat Ester, spending a lot of time at New Life Clothing and sometimes staying overnight at Ester's house. T.

454, 477. The evidence showed that he also became one of Pat Ester's crack cocaine distributors.

1. THE JUNE 26, 2002 TRANSACTION

Special Agent David Sebesta of the Drug Enforcement Administration Task Force had a cooperating defendant named Michael Engle. T. 315. Engle had been caught with crack cocaine, had pleaded guilty, and had cooperated pursuant to a plea agreement that provided that the government would make a motion for a downward departure in the event Engle rendered substantial assistance. T. 64-67. While cooperating, Engle made two controlled buys from Therase Warren. By the time of Warren's trial, Engle already had been sentenced to 108 months. T. 67. He understood that he would not receive any additional sentence reduction for testifying at Warren's trial. T. 67.

Engle had met Warren at a strip club in downtown Minneapolis in mid-2002. T. 69-70. Engle learned that Warren was connected to the New Life Clothing store, owned by Pat Ester. T. 70, 318. Special Agent Sebesta asked Engle to find out if there was any drug dealing going on at the store. T. 318. While talking with Warren at the clothing store one day, Engle asked Warren whether he could get any drugs from Warren. T. 70. Warren said he'd have to check with someone whom he did not name. T. 71. Warren later agreed to provide Engle with drugs.

The first transaction between Engle and Warren was for two ounces of crack cocaine. The jury heard recorded telephone calls between Engle and Warren, whose nickname is "Slow", T. 313, 470, setting up the deal. At trial, both Engle and Detective Sebesta identified the voice on the tapes as that of Therase Warren. T. 74, 81, 331. The arrangements were for Warren to sell Engle two ounces of crack, also known as a "dub" (double). T. 76, 78. Warren initially said the "ticket" (price) would be "8" ($800) per ounce. T. 75. He later raised the price to $900 per ounce after checking with his unnamed supplier. T. 80.

On June 26, 2002, Engle made a recorded call to Warren and the two agreed to meet at New Life Clothing a short time later. Police officers searched Engle and his vehicle and equipped him with a listening device. T. 82-83, 138-39. Officers followed Engle directly to New Life Clothing and observed Warren waiting out in front for Engle. T. 140-41, 244-45. When Engle pulled up, Warren immediately got into his car. T. 245. Officers had hoped the transaction would take place in front of New Life Clothing, T. 176, 178, 218, but Warren told Engle to drive. T. 84. Surveillance officers followed, but lost Engle and Warren temporarily when they ran a red light. T. 267. They were out of sight for 2 1/2 to 3 minutes, arriving back at New Life Clothing together about five minutes after they had left. T. 143, 245.

Engle dropped Warren off and was followed directly to the predetermined meet spot with his controlling officers. T. 143-44. Engle turned over the two ounces of crack cocaine that he had just purchased from Warren for $900 in prerecorded buy funds. T. 144. The tape recording of this transaction did not come out because the low wattage transmitter Engle was wearing was too far away from the stationary surveillance vehicle at New Life Clothing that was supposed to record the transmitter. T. 149, 248-50. Perhaps for this reason, the jury acquitted Warren of the June 26 deal.

2. THE JULY 15, 2002 TRANSACTION

On July 15, 2002, Engle made a second controlled purchase of crack cocaine from Warren. This one was for nine ounces of crack for $7,000. Once again, the jury heard a tape recorded call between Warren and Engle setting up the deal. The transaction was to take place at New Life Clothing at approximately 6:00 p.m. Id.

At the appointed time, officers again searched Engle and his car, finding no contraband. T. 151. Engle then made a call to Warren to tell him he was on his way. T. 152. Officers followed Engle directly to New Life Clothing. T. 153. Engle went in the store and emerged a few minutes later with Warren. T. 154. They got into Engle's car and drove a few blocks to a gas station. T. 154-55. Warren did not yet have the drugs, however, because the person he was getting them from had not yet brought them to the store. T. 156. Engle dropped Warren back at New Life Clothing,

then went and met with his controlling officers to tell them the deal had not yet occurred. T. 156.

Engle went back to New Life Clothing at about 6:30 p.m. and again met with Warren. T. 156-57. The drugs were still not available. To kill time, Engle and Warren went into a shoe store, where Engle bought a pair of tennis shoes that were later recovered from his car. T. 93, 164. They then went into a nearby bar. T. 290-91. While in the bar, Warren received a call on his cellular telephone. T. 94. Telephone records showed that this call was made from a cellular telephone later found inside of New Life Clothing. T. 326-28, 492. After taking the call, Warren told Engle the drugs had arrived. T. 94. Warren then walked down the block and went into New Life Clothing. T. 291. Engle got into his car, which was parked in front of the store. T. 94-95, 291.

A short time later, a surveillance officer saw Warren coming around the back corner of New Life Clothing. T. 292. Warren apparently had gone out the back door of the store. Warren was now carrying a plastic bag, which he did not have when he entered the store. T. 292-93. Warren got into Engle's car and the two drove off. T. 293. Surveillance officers followed the car. Deputy Martin had the vehicle in his sight the entire time. T. 260-63. No one got in or out. Id. A few blocks away from New Life Clothing, Engle pulled his car to the curb. T. 263. At that point, Warren removed a cardboard box from the plastic bag he had

been carrying. T. 96. Inside the cardboard box was a zip lock plastic baggie containing 8 1/2 ounces of crack cocaine. T. 96-97, 240. Engle paid Warren $7,000 in prerecorded buy money for the drugs. T. 96-97. He then drove Warren back to New Life Clothing and dropped him off. T. 98.

Engle then proceeded directly to the predetermined meet location where he turned over the drugs to the controlling officers. T. 160-63. Subsequent examination of the bag revealed two usable fingerprints. T. 229. One was from Therase Warren's left middle finger. T. 230. The other was from his right ring finger. Id.

Meanwhile, officers executed a search warrant at New Life Clothing. Therase Warren was found inside. T. 165. He had the $7,000 in prerecorded buy money in his pants pocket. T. 166. The cellular telephone Warren used to set up the July 15 deal was found in the store. T. 168-69, 320. One of the other people in the store was the owner, Pat Ester. T. 167. Ester's cell phone also was seized from inside the store. T. 324. Subsequent toll analysis revealed that Warren had made two calls to Ester's cell phone during the time that Warren and Engle were waiting for the drugs to be delivered to the clothing store. T. 328. A similar

pattern of calls occurred on the day of the first deal as well. T. 330-31.[1]

Warren's defense at trial was that he did not supply any drugs to Engle and that Engle must have somehow snuck the drugs into the controlled buys, even though officers searched him before each deal. Warren admitted his nickname was "Slow", but denied that it was his voice on the recorded telephone calls. T. 448-49, 466, 470. He claimed it was just a coincidence that he happened to be at New Life Clothing on both occasions when drugs deals were supposed to take place there with a person named "Slow". See T. 476-77. He tried to explain his fingerprints on the drug bag from the second transaction by claiming that Engle had the drugs, threw them at Warren in the car, and that Warren caught the bag but immediately dropped it when he realized it was drugs. T. 464. He tried to explain the $7,000 of buy money in his pants pocket by claiming that, after Engle threw the drugs at him, Engle then asked him to hold some money for him. T. 464-65. Warren testified that he agreed to do so, thinking he could not get in trouble for just holding money. Id. Rejecting this creative story, the jury found Warren guilty of the July 15 deal.

[1]Warren's cellular telephone had a menu of frequently called names and numbers. Under the entry for P.E. (Pat Ester) no phone number was listed. Instead, the word "secret" appeared in the display, signifying that Ester's number could be accessed from the phone's memory only with a secret access code. T. 322-23.

## ARGUMENT

I. WARREN HAS FAILED TO DEMONSTRATE ANY INEFFECTIVE ASSISTANCE ON THE PART OF HIS TRIAL COUNSEL

Warren first asserts that his trial counsel, Gary Bryant-Wolf, was ineffective in a number of respects. In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that his "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984); Garrett v. United States, 78 F.3d 1296, 1301 (8th Cir.), cert. denied, 117 S.Ct. 374 (1996). Strickland requires a deferential review of counsel's performance. There is a presumption that representation was competent, and that the challenged decisions constituted the permissible strategic and tactical choices of counsel. Strickland, 466 U.S. at 689. "[R]easonable trial strategy cannot rise to the level of ineffective assistance of counsel." English v. United States, 998 F.2d 609, 613 (8th Cir.), cert. denied, 510 U.S. 1001 (1993).

A. THE DRUG INVOLVED WAS CRACK COCAINE

Warren first claims his lawyer was ineffective for not challenging whether the drug involved in this case was crack cocaine, as opposed to some other form of cocaine base. There was no ineffective assistance. The government called the chemist at trial who testified that the drugs involved in the count of

conviction were "cocaine base," also known as "crack cocaine." T. 240. While it is true as Warren argues that not all cocaine base is crack, the sentencing guidelines define "crack" as "a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." U.S.S.G. § 2D1.1, application note (D) to drug quantity table. The drugs were in evidence and did, in fact, consist of a lumpy rocklike substance. The jury was told that they had to find that the substance involved was cocaine base ("crack") in order to convict. Court's Instruction No. 11. They did so find. Verdict Form at 2.

Warren offers no evidence or reason to believe that the drugs were not, in fact, crack cocaine. Warren himself testified at trial that the drugs were crack. T. 481-82. As such, Warren's lawyer was not ineffective for failing to argue that the drugs were not crack. E.g., Allen v. Nix, 55 F.3d 414, 417 (8th Cir. 1995)(no ineffective assistance in counsel's failure to file motion that was unlikely to succeed.)[2]

---

[2]Although the chemist did not specifically testify whether the crack at issue was made with sodium bicarbonate, that makes no difference here. There is no requirement that cocaine base must contain sodium bicarbonate (baking soda) in order to qualify as crack. United States v. Stewart, 122 F.3d 625, 628 (8th Cir. 1997).

B. THE COURT PROPERLY TREATED WARREN AS A CAREER OFFENDER

Warren next argues that his counsel was ineffective for failing to adequately investigate the nature of Warren's prior convictions. Warren was treated as a career offender based on two prior felony drug trafficking convictions as well as a prior felony conviction for aggravated criminal sexual abuse. PSR ¶ 26. Without providing any evidence, Warren claims that his two prior drug convictions were for possession, rather than distribution. But unsupported allegations are insufficient to warrant relief. United States v. Delgado, 162 F.3d 981, 983 (8th Cir. 1998); Voitik v. United States, 778 F.2d 1306, 1308 (8th Cir. 1985). They do even warrant an evidentiary hearing. Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995).

Furthermore, the record reflects that counsel did investigate Warren's criminal history quite thoroughly. This included hiring a defense investigator to travel to Cook County, Illinois to review the three criminal files. T. Sent. at 9-10. Although this was done primarily for the purpose of trying to verify Warren's claim that he was not represented on those felony cases -- a claim that turned out to be untrue -- if the files had reflected that the convictions were for a different offense than listed in Warren's presentence report, surely the investigator would have noticed it and reported as much. In short, Warren has offered no reason to believe that the PSR's description of his prior convictions is

inaccurate. His defense counsel therefore was not ineffective for failing to make such an argument. E.g., Allen, 55 F.3d at 417.[3]

C. ANY ERROR WITH RESPECT TO THE SECTION 851 ENHANCEMENT DID NOT PREJUDICE WARREN

Warren next claims his lawyer was ineffective for allegedly not telling him about the government's sentencing enhancement information, which doubled the mandatory minimum from 10 years to 20 years. It is undisputed that the government filed its sentencing enhancement information on September 25, 2002, which was well before the start of Warren's trial as required. 21 U.S.C. § 851(a)(1). Unfortunately, when the probation officer wrote the presentence report, he did not factor in the effect of the § 851 enhancement. He wrote that the mandatory minimum penalty for the count of conviction was 10 years rather than 20. PSR ¶ 46. Compounding the problem, the prosecutor did not notice the error and did not correct it until the time of sentencing. T. Sent. at 4-5. As a result, Warren alleges he was unaware of the 20-year mandatory minimum until the day of sentencing.

[3]Warren also contends he should not have been deemed to be in criminal history category VI because he only had enough criminal history points to put him in category V. Warren Memorandum at 12. But since Warren was properly classified as a career offender, his criminal history category had to be VI. U.S.S.G. § 4B1.1(b)("A career offender's criminal history category in every case under this subsection shall be category VI.") Moreover, the Court departed downward and sentenced Warren as if he were in criminal history category II. T. Sent. at 40-41.

Any error with respect to the § 851 enhancement did not prejudice Warren. Because Warren was a career offender, his sentencing guideline range was Level 37/Category VI = 360 months to life, which is well above the 20-year mandatory minimum. At the time of sentencing, the Court departed downward based on overstated criminal history category and imposed a sentence of 240 months. However, the Court specifically stated that it would not have gone lower than 240 months even if there were no § 851 enhancement and no 20-year mandatory minimum. T. Sent. at 40-41. Thus, any miscommunication regarding the section 851 enhancement did not prejudice Warren.

### D. DEFENSE COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO RAISE CERTAIN ISSUES ON APPEAL

Warren next claims his counsel should have raised certain issues on appeal. In his unsworn memorandum, Warren claims that he instructed his defense counsel to raise certain issues on appeal and defense counsel promised he would do so. Attached as Exhibit B is the affidavit of defense counsel, Gary Bryant-Wolf, who states that he discussed the issues to be raised on appeal with Warren at length and that there were no disagreements except one. Warren wanted his counsel to argue on appeal that the entire prosecution "was the result of improper and unethical conduct on the part of Mr. Paulsen [the prosecutor]." Exhibit B at 2. Defense counsel refused to include that claim in the appeal because he had

thoroughly investigated the matter and "found no evidence of any unethical behavior." Id.

Warren's unsupported claim that he instructed his defense counsel to raise other issues on appeal should not be considered in light of counsel's affidavit to the contrary. E.g., Delgado, 162 F.3d at 983 (unsupported allegations are insufficient to warrant relief). But even assuming for the sake of argument that Warren requested that these other issues be raised on appeal, he can establish no prejudice because the proposed issues are without merit.

1. The Prosecutor's Argument Regarding Fingerprints Did Not Misstate the Evidence

Warren cites to statements the prosecutor made during his rebuttal argument as presenting issues that should have been raised on appeal. See Petition at 6A. First, he claims the prosecutor misstated the evidence when he said that there were only two usable latent fingerprints on the plastic bag holding the nine ounces of crack cocaine and that both prints matched to Warren. T. 551. When defense counsel objected on this ground, T. 554-57, the Court overruled the objection because its recollection was that the prosecutor's statement was consistent with the evidence. T. 555. A review of the trial transcript confirms that the Court's recollection was correct. The fingerprint examiner testified in no uncertain terms that there were only two usable fingerprints on the drug bag and they both matched to Warren. T. 229-30, 235. Defense

counsel cannot be faulted for failing to raise an issue on appeal that had no factual basis. Allen, 55 F.3d at 417.

2. The Prosecutor Did Not Comment on Warren's Post-Arrest Silence

Warren next claims the prosecutor commented in his rebuttal argument on Warren's post-arrest silence and that this Fifth Amendment violation should have been raised on appeal. As shown below, there was no Fifth Amendment violation, so nothing to raise on appeal.

The negotiations for the two controlled purchases of crack cocaine from Warren were tape recorded. The cooperating defendant, Engle, spoke with a person who identified himself as "Slow." Warren's nickname is "Slow." Warren was always present at the time and place arranged during these taped negotiations.

At trial, Warren took the stand and denied that it was his voice on the tapes, although he admitted his nickname was "Slow." T. 448-49, 466, 470. This was the first time the government had ever been made aware of a claim that it was not Warren's voice on the tapes. During cross-examination of the case agent, Warren's counsel established that the government never sought to get a voice exemplar from Warren. T. 337. In response, the prosecutor asked the case agent, "When was the first time you learned that there was a claim that it was not Mr. Warren on the tapes?" T. 491. Following an objection and an off-the-record bench conference, the prosecutor withdrew the question.

In closing argument, defense counsel criticized the government for not getting a voice exemplar and posed the question, "Why no scientific evidence?" T. 536.

In rebuttal, the prosecutor responded to defense counsel's argument and question as follows:

> Voice exemplar, let me deal with that quickly. [Defense counsel] faults Mr. Sebesta for not getting a voice exemplar. Remember what Mr. Sebesta knew at the time Mr. Warren was arrested? He knew that the drug deal had been set up on tape between Engle and a guy called Slo. He knew that Mr. Warren had been caught twice on two deals. Mr. Warren's caught. Mr. Warren admits he's Slo. At that point if you are Sebesta do you need a voice exemplar to know who is on those tapes?
>
> And we come to court and we hear, oh, it's not me on the tapes. By the time of trial, it's too late to get a voice exemplar. But, again, you don't need it. You heard the tapes, you heard his voice you make the decision.

T. 547.

Defense counsel objected to this comment, alleging that it constituted a comment on the defendant's post-arrest silence. T. 554. The court ruled that it was a close question whether the statement even constituted a comment on the defendant's post-arrest silence, but agreed to give a curative instruction anyway that a defendant has a right to remain silent and that no adverse inference can be drawn from the exercise of that right. T. 559. Such an instruction was in fact given. T. 566.

Given the lack of any clear-cut Fifth Amendment violation, and the court's use of a curative instruction, there was no ineffective assistance of counsel in failing to raise this issue on appeal.

3. The Prosecutor's References to Pat Ester Were Appropriate

Warren also seems to argue that his counsel should have appealed based on the prosecutor's references during the trial to Pat Ester, who, the evidence indicated, was Warren's drug source of supply. Warren does not really say what was supposedly wrong with these comments. Unlike the Beckman case he cites, all these comments were based on evidence in the record. Furthermore, it was the defense who first introduced Mr. Ester into the trial. The centerpiece of Warren's defense was that he had simply traveled here from Chicago to reside with a childhood friend [Ester] who ran a business, New Life Clothing store, in Minneapolis. T. 52-53 (defense opening statement). This was supposed to explain why Warren was just "coincidentally" present at New Life Clothing on both occasions when Engle came there to make controlled purchases of crack cocaine. The government responded by showing that the childhood friend was, in fact, a convicted drug dealer who was quite likely the source of the drugs Warren sold to Engle. Once again, there was nothing to appeal.[4]

[4]In a separate case before Judge Doty, Ester was subsequently convicted at trial of several crack cocaine distribution offenses. Cr. 03-300(DSD). He is presently serving a sentence of 277 months.

## II. THE PROSECUTOR DID NOT MISREPRESENT HIS REASONS FOR DISMISSING AN UNRELATED CASE

Warren next contends that, during his sentencing hearing, the undersigned prosecutor misrepresented his reasons for voluntarily dismissing an unrelated case against a different defendant, Patrick Ester, in 2000. (This is a different case than the one referenced in footnote 4). In response to Warren's letter to the Court alleging that the case was dismissed because the prosecutor got caught in a lie, the prosecutor explained that the real reason was that the trial judge in that case had made comments during the trial that led the prosecutor to believe that, even if a guilty verdict were to be obtained, the judge would probably take it away. T. Sent. at 13. Warren now claims that a transcript of that earlier trial proves that the prosecutor's explanation was not truthful.

As an initial matter, Warren has failed to show how, even if his claim were true, it has any bearing on his conviction or sentence. Absent such a showing, the claim is not cognizable under § 2255.

Furthermore, the transcript of the earlier trial supports rather than contradicts the prosecutor's explanation at Warren's sentencing. The previous case involved a controlled purchase of crack cocaine from Patrick Ester at a South Minneapolis bar. The cooperating defendant who made the controlled buy was named Selwyn Hall. It was a difficult case because there were no surveillance

officers in the bar when the transaction occurred and because the transaction itself was not tape recorded.

The government's first witness was the case agent, Special Agent Daniel Faflak, who described the events leading up to the controlled buy. The cooperating defendant was to testify later. The case never got that far because the district court chose to cross-examine the case agent. Part of the court's questioning suggested that the cooperating defendant could have smuggled the drugs into the controlled buy in his body cavity, a scenario not even the defense counsel had posited. Exhibit A at 82-83. The court also got the case agent to concede that 24 grams of crack cocaine is not an amount that is usually charged in federal court. Id., at 83. The court also was openly critical of the fact that the transaction was not tape recorded. Id., at 90-91. All this was done in front of the jury. The court also informed the prosecutor at the bench, "I'm not happy about this case, I'm really not." Exhibit A at 89.[5]

At this point the prosecutor realized that, even if a guilty verdict were returned, the district court probably would not let it

[5]The United States does not have a full copy of the transcript, only the portion that is attached as exhibit A. This excerpt was submitted by the opposing party as an exhibit in the 2003 case against Patrick Ester that is referenced in footnote 4 above. The original is not on file with the clerk of court and the undersigned has been unable to obtain a copy of the full transcript because the court reporter, Brenda Anderson, is no longer with the federal courts.

stand. Rather than prolong the trial, the prosecutor sought and obtained permission from his supervisors over the lunch hour to voluntarily dismiss the case. This was done immediately upon the start of the afternoon session. After the prosecutor dismissed the case, the court went out of its way to state that "I appreciate the efforts of both counsel, and I highly respect both of you." Id., at 96 (emphasis added).

As for Warren's specific claim that the prosecutor got caught in a lie, that claim is based on an isolated comment of the district court that needs to be placed in context. Just prior to trial, the prosecutor learned that the cooperating defendant, Selwyn Hall, had been an informant in Florida 17 years earlier. This information was promptly disclosed to the defense, Exhibit A at 88, but the Florida records of exactly what Hall had done as an informant were not immediately available because they were archived. Id. At trial, when the prosecutor attempted to have the case agent explain this in response to defense counsel's cross-examination, the court cut off the questioning and called the parties to the bench. Id. It was then that the court made the comment upon which Warren relies. Although the court started off suggesting that the prosecutor had misinformed the court about his knowledge of Hall's prior service as an informant, what the court ended up saying is that a local DEA agent had known about Hall's prior service for some time "and had not turned that information

over to you", but that the agent's knowledge must still be imputed to the prosecutor, a proposition with which the prosecutor readily agreed. Exhibit A at 89 (emphasis added). Further evidence that the district court was not actually accusing the prosecutor of deceit is that the court complimented counsel on the record at the end of the case. Id. at 96. He presumably would not have done so if he thought the prosecutor had acted deceitfully.

III. WARREN'S BLAKELY/BOOKER CLAIM MAY NOT BE RAISED IN A SECTION 2255 PETITION

Warren next contends his Sixth Amendment rights were violated because the jury allegedly was not called upon to decide the drug quantity. This is a Blakely and/or Booker claim. The law is clear, however, that such claims may not be brought in a section 2255 petition because Blakely and Booker are not retroactive to cases on collateral review. Never Misses A Shot v. United States, 413 F.3d 781, 783-84 (8th Cir. 2005).

Furthermore, Warren's argument is factually incorrect because the jury was, in fact, asked to decide drug quantity. The jury made a finding that the amount of drugs was 50 or more grams of cocaine base ("crack"). Because Warren was a career offender, this drug quantity finding necessitated a base offense level of 37 and a criminal history category of VI, for a guideline range of 360 months to life. U.S.S.G. § 4B1.1(b). In addition, because Warren had a prior felony drug conviction as to which the government had filed a sentencing enhancement information, the jury's finding

triggered a mandatory minimum penalty of 20 years. 21 U.S.C. § 841(b)(1)(A), 851, which was the sentence the court imposed.

## IV. WARREN'S CHALLENGE TO THE DISTRICT COURT'S SUBJECT MATTER JURISDICTION IS NOT PROPERLY BEFORE THE COURT AND IS MERITLESS IN ANY EVENT

Warren next seeks to challenge the application of the federal drug laws to him. He seems to be arguing that the drug laws apply only to people such as pharmacists who are authorized to deal in controlled substances.

This claim should be rejected as untimely. It was not raised in Warren's original § 2255 petition. It was raised for the first time only in Warren's memorandum in support of his petition filed on or about October 17, 2005. This is well beyond the one-year limitations period for filing a § 2255 petition. 28 U.S.C. § 2255.[6]

The jurisdictional claim also is not properly before the Court because it could have been, but was not, raised on direct appeal. Claims that could have been raised on direct appeal will not be considered in a § 2255 proceeding absent cause and substantial, actual prejudice. Ford v. United States, 983 F.2d 897, 898-99 (8th Cir. 1993)(per curiam); see also Reid v. United States, 976 F.2d

---

[6] The Eighth Circuit affirmed Warren's conviction on May 17, 2004. His conviction became final, at the latest, on or about August 17, 2004 when the 90-day period for seeking certiorari to the Supreme Court expired. Clay v. United States, 537 U.S. 522, 525 (2003). Because the new claim does not relate back to any timely filed claim in Warren's original § 2255 petition, it is time-barred.

446, 447 (8th Cir. 1992)(Section 2255 is not a substitute for direct appeal).

Finally, Warren's jurisdictional challenge is meritless on its face. Warren does not cite a single case in support of his apparent argument that the nation's drug laws apply only to pharmacists or other regulated persons. The plain language of 21 U.S.C. 841 states that "it shall be unlawful for <u>any person</u> knowingly or intentionally to . . . distribute . . . a controlled substance." (Emphasis added.)

## CONCLUSION

All of Warren's claims are without legal or factual merit. No evidentiary hearing is warranted. The petition should be summarily denied.

Respectfully submitted,

Dated: October 31, 2005

THOMAS B. HEFFELFINGER
United States Attorney

s/Jeffrey S. Paulsen
BY: JEFFREY S. PAULSEN
Assistant U.S. Attorney
Attorney ID Number 144332