A. That's what that report reads.
Q. And Mr. Stinson is about my complexion, isn't he?
A. Frater?
Q. Frater, yes, I'm sorry?
A. I guess he could be.
Q. And Mr. Hall is of a lighter hue or a lighter complexion?
A. Yes.
Q. And that's in Mr. Stinson's statement, it said it was a light person, correct?
A. I don't know what he's comparing it to. That's his statement.
Q. That wasn't my question?
A. Yes, that's what he said.
MR. SMITH: Thank you. No further questions.
MR. PAULSEN: Nothing further, Your Honor.
THE COURT: I have some questions. Sir, how long have you been with the Customs?
THE WITNESS: Thirteen years.
THE COURT: What type of training have you gone through?
THE WITNESS: I've attended what's call FLETC. It's the Federal Law Enforcement Training Center. It's held in Glencoe, Georgia. The initial phase is approximately four months, and then there is another

**EXHIBIT A**

additional four months of Customs training.

THE COURT: And where have you been stationed during your stay with the Customs?

THE WITNESS: My first 10 years I was in Houston, Texas. I've been up here in Minnesota about three years.

THE COURT: And what have your duties been during those 13 years?

THE WITNESS: Eleven of those years, it's been narcotics investigations; two years of what we call fraud, and it's basically white collar crime-type investigations. In Houston I did investigations air smuggling rings, smuggling, vehicular smuggling. We worked mostly targeting Columbian organizations. I've also worked currency cases.

THE COURT: In your duties as a Custom agents, do you ever use dogs?

THE WITNESS: Yes.

THE COURT: And why do you use dogs?

THE WITNESS: They are a tool, basically. They are trained to detect the odors of narcotics. It's just additional evidence if they should alert on a person or a vehicle that there may be narcotics present.

THE COURT: And when they alert, does that mean -- do they know how long the drugs have been in the car?

THE WITNESS: No.

THE COURT: Other than that the drugs at some point and time have been in the car, is that correct?

THE WITNESS: Yes.

THE COURT: Do they have sensitive noses.

THE WITNESS: Yes.

THE COURT: And I suspect that's the reason why they are used?

THE WITNESS: Yes.

THE COURT: And they are very accurate?

THE WITNESS: I can't give a percentage of time, but they are fairly accurate.

THE COURT: You are a Customs agent, and you use dogs. Why wouldn't you use them if they weren't accurate?

THE WITNESS: I personally know that they have not detected stuff when we know it was there. I would give it an eighty to ninety percent.

THE COURT: Now, have you been aware of what the Customs Agency policy is dealing with strip searches are?

THE WITNESS: Yes, sir.

THE COURT: And could you tell the jury what those are?

THE WITNESS: To perform a strip search. Basically, we have to have -- not probable cause, but it's a lot of --

THE COURT: I'm not worried about that. I'm

asking why would you as a Customs Agent do strip searches?

THE WITNESS: If we had a very large suspicion that an individual was concealing narcotics on their body as opposed to just having it in their pocket or something like that.

THE COURT: Is it routine for runners of drugs to hide drugs in their cavities?

THE WITNESS: I wouldn't call it routinely, but, yes, it does happen. They swallow it, they hide it in the body cavities, yes.

THE COURT: Could you tell the jury how many ounces 24 grams of crack cocaine is?

THE WITNESS: It's short of an ounce.

THE COURT: Is that a lot of drugs?

THE WITNESS: No.

THE COURT: What is the value of that?

THE WITNESS: I personally don't know what the street value would be. I just know that we paid a thousand dollars for it.

THE COURT: You don't know what the value is?

THE WITNESS: No, sir.

THE COURT: When that drug came to you, how big around was it?

THE WITNESS: It was in five small pieces. It was not one large piece. It was five smaller pieces.

THE COURT: Would you consider those pieces to be able to be hidden in the body cavity?

THE WITNESS: Yes.

THE COURT: 24 grams of cocaine is not an amount that is usually charged in federal court, is it?

THE WITNESS: No, sir.

THE COURT: Now, Mr. Hall, he talked to a number of police officers, is that correct?

THE WITNESS: Yes, sir.

THE COURT: And you are not aware of any other plea agreements that he may have had with anyone else because there were a number of investigations going on here?

THE WITNESS: I don't know for sure. When there was a consideration on the state charges, we weren't informed of everything that was exactly going on. I don't think there was a plea agreement made.

THE COURT: Well, was there something out there in the air?

THE WITNESS: I think there could have been at one time.

THE COURT: And what could that have been so we can pin it down?

THE WITNESS: I believe it was just that he would testify, and I don't know what kind of consideration. I

truly don't know. I wasn't involved.

THE COURT: Was that with the homicide department?

THE WITNESS: The county district attorney. I think homicide department was involved in that investigation with his assault, and their unit covers all types of assaults, not just specifically murder.

THE COURT: Does that generate any questions, Counsel?

MR. SMITH: Yes, Your Honor.

FURTHER RE-CROSS EXAMINATION

BY MR. SMITH:

Q. Agent, when you are doing a joint investigation, isn't it good for you to obtain information from the other parties to see what types of agreements they have with your witnesses, also?

A. Yes.

Q. And wouldn't that be good in Mr. Ester's case to have that information so we know what promises have been made to Mr. Hall in reference to his testimony?

A. Yes.

Q. And that's in reference to him receiving a fair trial, correct?

A. Yes.

Q. So, would it be a misstep on your part not to get that

information to us?

MR. PAULSEN: I'm going to object as assuming facts not in evidence.

THE COURT: Sustained.

Q. And Mr. Hall was never charged with anything, correct?

A. Correct.

Q. And with this being less than 24 grams of cocaine, wasn't this joint issue in an attempt to find out if Mr. Ester knew anything about the murder? Isn't that why he was charged in federal court?

A. I don't think -- I just investigate. I don't prosecute. That's up to the United States Attorneys Office to determine who's prosecuted for what.

Q. And did you ever receive written confirmation from the State of Florida concerning the past history of Mr. Ester -- I mean not Mr. Ester, Mr. Hall?

A. As far as him being an informant down there?

Q. Yes.

A. No, sir.

Q. You don't have any information about his trustworthiness or anything of that sort, correct?

A. They did not have any records. They were so old, they have been archived.

Q. Archived doesn't mean they have been destroyed, that means that they have been put up, correct?

A. Yes.
Q. And if we wanted to go to Hennepin County and get something out of the archives, all we would need is the case number, correct?
A. I assume so, yes.
Q. So, that would be fairly easy to do, correct?
A. I don't know. I'm with the DEA system and I'm not real familiar with theirs.
Q. If something is archived, thought, you wouldn't think it would be very difficult to pull that information out, correct?
A. No, sir.
Q. And to your knowledge, since you are the assistant case agent on this case, have the defense received any of that information yet?
A. As far as his past history?
Q. Yes.
A. No.
Q. And we are in the midst of a serious trial, correct?
A. Yes.
Q. And when you stated that the vehicle was searched -- was not searched, that's incorrect, correct?
A. I was not there, sir. I can't testify whether it was or was not.
Q. But the dogs going in, that's a search? That dog is a

police officer, correct?
A. Yes.
Q. And if the dog is sniffing the car, the car is searched by the dog, correct?
A. It might be outside the car or inside the car.
Q. If he's inside the car, he's searching the car, right?
A. Yes.
Q. And the dog's nose is able to pick up things while he's outside the car, also, right?
A. Most of the time, yes.
Q. As a matter of fact, the dog can detect something that's in a locked trunk covered with coffee, couldn't it?
A. Sometimes.
Q. And on that day, nothing was found in Mr. Ester's car, correct?
A. Correct.
Q. And Mr. Hall had told you that Mr. Ester was on his way to his house to bring him some drugs, correct?
A. Yes.
Q. So, the stop would not substantiate that statement by Mr. Hall, correct?
A. Correct.
MR. SMITH: No further questions.
THE COURT: Anything for the Government.

FURTHER RE-DIRECT EXAMINATION

BY MR. PAULSEN:

Q. Did we obtain a verbatim transcript of Selwyn Hall's guilty plea over in state court to the assault charge?

A. Yes.

Q. We gave it to the defense?

A. Yes.

Q. They have that?

A. Yes.

Q. And we gave them information about Mr. Hall's prior services as an informant down in Florida?

A. Yes.

Q. Which occurred 17 years ago?

A. Yes.

Q. And as you've stated, the records of that are archived?

A. Yes.

Q. We don't have those records?

A. No.

Q. There was some record --

THE COURT: Mr. Paulsen, I would not go there. Approach the Bench.

(Whereas, the following conference was had at the Bench, on the record, and out of the hearing of the jury.)

THE COURT: One, if they are in the knowledge of the Government, then you have them. All right. And, two, we'll talk about it later. I'm pretty sure that you

misinformed me about your knowledge of his -- Mr. Hall's services with the DEA because when we had the pretrial conference, Mr. Smith brought up the police records, and I believe you said that was the first time that you knew about it, but it turns out your DEA, your man here had already called down to Florida regarding his service and had not turned that information over to you and that still links it to you.

MR. PAULSEN: Sure.

THE COURT: I don't want you to go into this area at all. We don't know anything about it because I may order you to get those records, depending on what Mr. Hall says. I'm not happy about this case, I'm really not.

(End of Bench conference.)

MR. PAULSEN: No further questions.

THE COURT: Now, Agent, dealing with -- you worked with the DEA before?

THE WITNESS: Since I've been here in Minnesota.

THE COURT: And dealing with conversations that may be made between an informant and a suspected drug dealer, those can be recorded, is that correct?

THE WITNESS: Yes.

THE COURT: The DEA, the local police all have the facilities to record conversations back and forth?

THE WITNESS: Yes.

THE COURT: Was that done in this case?

THE WITNESS: No, sir.

THE COURT: Was any taping done of what happened in the bar?

THE WITNESS: An attempt was made to listen to it, but there was no tape made, sir.

THE COURT: Okay. Listen to my question. Usually the buttons are pushed and someone is listening?

THE WITNESS: Yes, sir.

THE COURT: I'm asking whether or not the buttons were pushed and whether or not a tape was made?

THE WITNESS: No, there was tape. There was no -- the this device did not have a tape recorder attached to it.

THE COURT: Not the device, but the person listening to the signal?

THE WITNESS: Yes, sir. He did not have a tape recorder with the listening portion of that device for that device.

THE COURT: Then how was anything going to be tape recorded?

THE WITNESS: It wasn't, sir.

THE COURT: Walk me through that, again. You mean you have a bug, a wire and you don't -- you don't have a tape, a tape recorder of what the conversation is?

THE WITNESS: Correct, sir.

THE COURT: Generate any further questions.

MR. SMITH: Yes, Your Honor.

FURTHER RE-CROSS EXAMINATION

BY MR. SMITH:

Q. In the trans -- the person that was listening to the transmission, did they not state that the only reason it was not taped was due to the fact that it was unintelligible, isn't that correct?

A. Well, maybe I said that it wasn't taped because there was no tape player available. The person listening couldn't determine what was being said because he couldn't understand it.

Q. No, I'm sorry. My question to you was, the person that was in charge of the listening device, they didn't state they didn't tape it because there wasn't a tape recorder, they stated that they didn't tape it because it was unintelligible, correct?

A. That may be, yes. I can't answer that question with a yes or no because I didn't -- I was not the person monitoring it.

Q. So, your testimony to the Court just now where you stated that -- where you stated that there was no tape recorder, was that true or not?

A. There was no tape recorder, yes, sir.

Q. But in the submission that we received from the Government, the person that was in charge of the taping and the wire stated that the only reason it wasn't taped was because it was unintelligible. Would you dispute that?

A. No. I don't know what statement you are talking about, sir.

MR. SMITH: Your Honor, I would like to make an offer of proof and submit a memorandum to the Court.

THE COURT: Well, first off, I don't know if it was made. Show him the sheet of paper. If there is a sheet of paper that shows that, let him read it.

Q. Could you read Paragraph 4?

A. At approximately 1620 hours, that's 4:20, drove CS to a parking lot approximately one block from the bar. The CS exited the vehicle CS and walked to the bar. Th CS was observed entering the bar by surveillance units. Sebesta was monitoring the transmitting advice worn by the CS. However, due to poor reception of the conversation was mostly unintelligible and not recorded.

Q. And that's your own report, correct?

A. Yes, sir.

MR. SMITH: No further questions.

THE COURT: Mr. Paulsen, any questions.

MR. PAULSEN: No, sir. Nothing further.

THE COURT: You may step down. We'll take our

afternoon break at this time. We'll recess until 1:30; 1:30.

(Noon recess taken.)

(The following was heard in open court, on the record, and out of the hearing of the jury.)

THE COURT: Mr. Paulsen.

MR. PAULSEN: Your Honor, the United States moves pursuant to Rule 48(a).

THE COURT: The defendant has to consent to this, and I haven't done any research, and for the record tell me whether jeopardy attaches and whether or not this will be retried?

MR. PAULSEN: Jeopardy is attached.

THE COURT: Mr. Smith.

MR. SMITH: No opposition from the defense, Your Honor.

THE COURT: The Court will sign the order. Let's bring out the jury.

Counsel, I don't know if you were aware, Mr. Hall had some mental illness, bipolar mental illness, and also he's made accusations that he was in the Witness Protection Program. I don't know if the Government knew that.

MR. PAULSEN: I did not, Your Honor.

THE COURT: I don't know if the defense knew that.

MR. SMITH: Yes, Your Honor.

THE COURT: That was the information that he gave the Judge in Hennepin County.

(End of motion in open court, on the record, and out of the hearing of the jury.)

THE COURT: Members of the jury, we have come to a resolution of this matter. The Government has filed a dismissal of this matter, and this matter is dismissed, and there is no case against Mr. Ester now.

So, I will not need your services. However, I want to let you know that, members of the jury, you are the factfinders in this case, and if this had gone to a final conclusion, you would have had to come to a verdict in this matter.

However, there is a whole range of dispositions in cases, and sometimes it takes the courtroom to crystallize things, and is rather now than later. That's what has happened. The Government has filed a dismissal, and the defense has not objected to that, so the matter is dismissed.

You may keep your notes. I think there were a couple of exhibits that were handed out to you. You can keep those, too. And you'll go back down to the jury assembly room and get further orders on what you should be doing in the next couple of days.

I may see you next week because I have another trial starting. I don't know if they called you up or not. But any event for the Government, Mr. Paulsen, and the defense, Mr. Smith, and the defendant, Mr. Ester, everyone thanks you for your time and consideration in this case.

Again, the jury system is the bedrock of our system. Next to voting, this is the most important thing you can do as a citizen in the United States. And, remember, on the Justice Department there is a saying, "When justice is done, the Government wins."

(Jury dismissed.)

THE COURT: What is the status of Mr. Ester?

MR. SMITH: Your Honor, Mr. Ester is in custody, and we would like to make a motion that he be released from custody.

THE COURT: First, don't we have a supervised release violation which is based on this case, is that correct?

MR. PAULSEN: Yes, Your Honor.

THE COURT: Is the Government going to release that?

MR. PAULSEN: So moved.

THE COURT: That's dismissed. Mr. Ester is free to go.

THE DEFENDANT: Thank you.

THE COURT: I appreciate the efforts of both counsel, and I highly respect both of you.

REPORTER'S CERTIFICATE

I, Brenda E. Anderson, Registered Professional Reporter, do hereby certify that the foregoing transcript is a true and correct transcript of the proceedings in the above-entitled matter.

CERTIFIED: ____________________

________________________________
Brenda E. Anderson, RPR