**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,

Plaintiff-Respondent,

v.

Therase Lashown Warren, a/k/a "Slow,"

Petitioner-Defendant.

Criminal No. 02-248(1) (DWF/SRN)
Civil No. 05-805 (DWF)

**ORDER**

---

Jeffrey S. Paulsen, Assistant United States Attorney, United States Attorney's Office, counsel for Plaintiff-Respondent.

Therase Lashown Warren, *Pro Se*, Petitioner-Defendant.

Gary R. Bryant-Wolf, Esq., Bryant-Wolf Law Office, counsel for Petitioner-Defendant.

---

This matter is before the undersigned United States District Court Judge on Petitioner-Defendant Therase Lashown Warren's ("Petitioner-Defendant") motion pursuant to 28 U.S.C. § 2255 for an order of this Court vacating, correcting, recalculating, or modifying his sentence. Petitioner-Defendant has also requested that the Court grant an evidentiary hearing. Petitioner-Defendant further asserts that he was denied ineffective assistance of counsel by his trial counsel.

In Petitioner-Defendant's section 2255 petition he claims that his trial counsel, Gary Bryant-Wolf, was ineffective for failing to challenge that one of the drugs was crack, for failing to challenge his criminal history, for failing to inform him of the government's sentencing enhancement

information, for failing to present so-called "exculpatory" evidence, and for failing to raise certain issues on appeal. Petitioner-Defendant also claims that during his sentencing hearing the prosecutor misstated the reasons why he dismissed an unrelated case against a different defendant. However, Petitioner-Defendant fails to explain how any such alleged misstatement, even if it did occur, has any bearing on his conviction or sentence. Petitioner-Defendant also seeks to raise a *Booker* claim. Finally, Petitioner-Defendant has asserted that the federal drug laws do not apply to him. The government opposes Petitioner-Defendant's motion.

## BACKGROUND

As the record illustrates, the case before the Court arose out of an investigation of a drug dealer named Patrick Ester. In 1995, Patrick Ester was convicted in the United States District Court - District of Minnesota of conspiracy to distribute cocaine and crack cocaine. He served his sentence of 50-months imprisonment and was still on supervised release at the time of the investigation in the above-entitled matter. After his release from prison, Ester opened up a store called New Life Clothing at 29th and Chicago in South Minneapolis. Law enforcement officers at that time had information that Ester was dealing drugs out of New Life Clothing.

The record establishes that Petitioner-Defendant had a lengthy criminal history, including two prior felony drug convictions and a conviction for aggravated sexual assault involving a victim under the age of 13. Petitioner-Defendant was released from prison in February 2002. At that time, Petitioner-Defendant decided to move from Illinois to Minnesota to be with his boyhood friend, Patrick Ester. Upon his arrival in Minnesota, Petitioner-Defendant had no job or other means of supporting himself. At that time, Petitioner-Defendant looked up Patrick Ester and began spending a lot of time at New

Life Clothing and sometimes stayed overnight at Ester's house. The evidence also established that Petitioner-Defendant became one of Patrick Ester's crack cocaine distributors.

**June 26, 2002, Transaction**

Special Agent David Sebesta of the Drug Enforcement Administration Task Force, had a cooperating defendant named Michael Engle. Engle had been caught with crack cocaine, had entered a plea of guilty, and had cooperated pursuant to a plea agreement that provided that the government would make a motion for a downward departure in the event that Engle rendered substantial assistance. During this cooperation, Engle made two controlled buys from Petitioner-Defendant. By the time of Petitioner-Defendant's trial, Engle had already been sentenced to 108 months. Engle understood that he would not receive any additional sentence reduction for testifying at Warren's trial. The cooperation by Engle that involved testimony at Petitioner-Defendant's trial was part of the original substantial assistance agreement with the government.

Michael Engle had met Petitioner-Defendant at a strip club in downtown Minneapolis in the middle of 2002. At that time, Engle learned that Petitioner-Defendant was connected to the New Life Clothing store owned by Patrick Ester. Special Agent Sebesta asked Engle to find out if there was any drug dealing going on at the New Life Clothing store. While talking with Petitioner-Defendant at the clothing store one day, Engle asked Petitioner-Defendant whether he could get any drugs from him. Petitioner-Defendant responded that he would have to check with someone whom he did not name. Petitioner-Defendant later agreed to provide Engle with drugs.

The first transaction between Engle and Petitioner-Defendant was for two ounces of crack cocaine. The record shows that the jury heard recorded telephone calls between Engle and Petitioner-

Defendant, whose nickname was "Slow," setting up the deal. At trial, both Engle and Detective Sebesta identified the voice on the tapes as that of Petitioner-Defendant. Arrangements were then made for Petitioner-Defendant to sell Engle two ounces of crack, also known as a "duv" (double). Petitioner-Defendant initially stated that the price would be $800 per ounce. He later raised the price to $900 per ounce after checking with his unnamed supplier.

On June 26, 2002, Engle made a recorded call to Petitioner-Defendant and the two agreed to meet at New Life Clothing a short time later. Law enforcement officers searched Engle and his vehicle and equipped him with a listening device. The officers followed Engle directly to New Life Clothing and observed Petitioner-Defendant waiting out in front for Engle. When Engle pulled up, Petitioner-Defendant immediately got into his car. The officers assumed that the transaction would take place in front of New Life Clothing. It did not because Petitioner-Defendant told Engle to drive. Surveillance officers followed, but lost Engle and Petitioner-Defendant temporarily when they ran a red light. Engle and Petitioner-Defendant were out of sight for approximately two and half to three minutes, arriving back at New Life Clothing together about five minutes after they had left.

Engle dropped Petitioner-Defendant off and was followed directly to the predetermined meet spot with his controlling officers. Engle then turned over the two ounces of crack cocaine that he had just purchased from Petitioner-Defendant for $900 in pre-recorded buy funds. The tape-recording of this transaction did not work because the low wattage transmitter Engle was wearing was too far away from the stationary surveillance vehicle at New Life Clothing that was supposed to record the transmitter. The Court will not speculate as to whether this was the reason why the jury acquitted Petitioner-Defendant of the June 26 drug deal.

**July 15, 2002, Transaction**

On July 15, 2002, Engle made a second controlled purchase of crack cocaine from Petitioner-Defendant. This transaction involved nine ounces of crack cocaine for $7,000. Once again, the jury heard a tape-recorded phone call between Petitioner-Defendant and Engle setting up the drug deal. The transaction was to take place at New Life Clothing at approximately 6:00 p.m.

Officers again searched Engle and his car, finding no contraband. Engle then made a call to Petitioner-Defendant to tell him he was on his way. Law enforcement officers followed Engle directly to New Life Clothing. Engle then went in the store and emerged a few minutes later with Petitioner-Defendant. They got in to Engle's car and drove a few block to a gas station. Petitioner-Defendant did not yet have the drugs because the person he was getting them from had not yet brought them to the New Life Clothing store. Engle dropped Petitioner-Defendant back at New Life Clothing, then went back with his controlling officers to tell them that the drug deal had not yet occurred.

Engle went back to New Life Clothing at about 6:30 p.m. and again met with Petitioner-Defendant. The drugs were still not available. To pass the time, Engle and the Petitioner-Defendant went into a shoe store where Engle bought a pair of tennis shoes that were later recovered from his car. The two of them then went into a nearby bar. While in the bar, the Petitioner-Defendant received a call on his cellular phone. Telephone records show that this call was made from a cellular phone later found inside the New Life Clothing store. After taking the call, Petitioner-Defendant told Engle the drugs had arrived. Petitioner-Defendant then walked down the block and went into New Life Clothing. Engle got into his car, which was parked in front of the store.

A short time later, a surveillance officer saw Petitioner-Defendant coming around the back corner of New Life Clothing. Petitioner-Defendant apparently had gone out the back door of the store. He was now carrying a plastic bag, which he did not have when he entered the New Life Clothing store. Petitioner-Defendant got back into Engle's car and the two drove off. Surveillance officers followed the car. Deputy Martin had the vehicle in his sight the entire time. No one got in or out of the vehicle. A few blocks away from the New Life Clothing store, Engle pulled his car to the curb. At that point, Petitioner-Defendant removed a cardboard box from the plastic bag he had been carrying. Inside the cardboard box was a Zip-loc plastic baggie containing eight and one-half ounces of crack cocaine. Engle then paid Petitioner-Defendant $7,000 in pre-recorded buy money for the drugs. He then drove Petitioner-Defendant back to New Life Clothing and dropped him off. Engle then proceeded directly to the predetermined meet location where he turned over the drugs to the law enforcement officers involved. Subsequent examination of the bag revealed two usable fingerprints. One was from Petitioner-Defendant's left middle finger. The other was from his right ring finger.

During this same time, law enforcement officers executed a search warrant at New Life Clothing. Petitioner-Defendant was found inside. Petitioner-Defendant had the $7,000 in prerecorded buy money in his pants pocket. The cellular phone that he had used to set up the July 15th drug deal was found in the store. One of the other people in the store was the owner, Patrick Ester. Ester's cellular phone was seized from inside the store. Subsequent toll analysis revealed that Petitioner-Defendant had made two calls to Ester's cellular phone during the time that Petitioner-Defendant and Engle were waiting for the drugs to be delivered to the clothing store. A similar pattern of calls occurred on the day of the first deal as well.

Petitioner-Defendant's defense at trial was that he did not supply any drugs to Engle and that Engle must of somehow snuck the drugs into the controlled buys, even though officers searched him before each deal. Petitioner-Defendant has admitted that his nickname was "Slow," but denied that it was his voice on the recorded telephone calls.

Petitioner-Defendant asserted that it was just a coincidence that he happened to be at New Life Clothing on both occasions when drug deals were supposed to take place with a person named "Slow." Petitioner-Defendant's purported explanation for the fingerprints being on the drug bag from the second transaction was that Engle had the drugs, threw them at Petitioner-Defendant and that Petitioner-Defendant caught the bag, but immediately dropped it when he realized it was full of drugs. Petitioner-Defendant also asserted that he had $7,000 of buy money in his pants pocket because Engle threw the drugs at him and, at the same time, Engle asked him to hold some money for him. Petitioner-Defendant testified that he agreed to do so, thinking he would not get into trouble for just holding money temporarily. The jury rejected the testimony and defense of the Petitioner-Defendant and found him guilty of the July 15th drug transaction.

Pursuant to the jury's verdict, on April 3, 2003, the Court sentenced the Petitioner-Defendant to 240 months.

## DISCUSSION

Petitioner-Defendant first asserts that his trial lawyer, Gary Bryant-Wolf, was ineffective in a number of respects. In order to prevail on such a claim of ineffective assistance of counsel, a defendant must show that his "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceedings would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Garrett v. United States*, 78 F.3d 1296, 1301 (8th Cir.), *cert. denied*, 117 S. Ct. 374 (1996).

Petitioner-Defendant first claims that his lawyer was ineffective for not challenging whether the drug involved in the case was crack cocaine as opposed to some other form of cocaine base. Contrary to the assertions of Petitioner-Defendant, the government called a chemist at trial to testify that the drugs involved in the count of conviction involved were "cocaine base," also known as crack cocaine.

Based upon the record before the Court, Petitioner-Defendant offers absolutely no evidence or reason to believe that the drugs involved were not, in fact, crack cocaine. He testified himself at trial that the drugs were crack. As such, there is no conceivable way that Petitioner-Defendant's trial counsel was ineffective for failing to argue that the drugs were not crack. His argument is without merit.

Petitioner-Defendant also argues that his lawyer was ineffective for failing to adequately investigate the nature of his prior convictions. It is true that Petitioner-Defendant was treated as a career offender based upon two prior felony drug trafficking convictions, as well as a prior felony conviction for aggravated criminal sexual abuse. Petitioner-Defendant asserts that his two prior drug convictions were for possession, rather than distribution. There is no evidence of this assertion in record. There is no basis, on the record before this Court, for this Court to order an evidentiary hearing.

Further, the record reflects that Petitioner-Defendant's lawyer did investigate his criminal history thoroughly. This included hiring a defense investigator to travel to Cook County, Illinois, to review the three criminal files. Although it is true that this was done primarily for the purpose of trying

to verify Petitioner-Defendant's claim that he was not represented on those felony cases–a claim that turned out to be untrue–if the files had in fact reflected that the convictions were for a different offense than listed in the court's presentence report, certainly the investigator would have noticed it and reported it as such. There is no reason to believe that such an inconsistency existed. Petitioner-Defendant has offered no reason for this Court to believe or conclude that the presentence report's description of his prior convictions is false or inaccurate. Consequently, there is no manner in which his trial counsel could have been ineffective for failing to make such an argument.

In addition to the claims of the Petitioner-Defendant set forth above, he also claims that his lawyer was ineffective for allegedly not telling him about the government's sentencing enhancement information which doubled the mandatory minimum from 10 years to 20 years. The record clearly showed that the government filed its sentencing enhancement information on September 25, 2002, which was well before the start of Petitioner-Defendant's trial, as required. 21 U.S.C. § 851(a)(1). It is true, that when the probation officer wrote the presentence report, he did not factor in the effect of the section 851 enhancement. At that time, the probation officer wrote that the mandatory minimum penalty for the count of conviction was 10 years, rather than 20 years. This problem was perhaps exacerbated by the fact that neither the Assistant United States Attorney nor the Court observed the error and corrected it until the time of sentencing. For that reason, Petitioner-Defendant alleges that he was unaware of the 20-year mandatory minimum until the day of sentencing.

However, any error with respect to the section 851 enhancement did not prejudice Petitioner-Defendant. Ironically, because Petitioner-Defendant was a career offender, his sentencing guidelines range was level 37 - category VI, which resulted in a 360-month to life sentence, which was

well above the 20-year mandatory minimum. The Court states "ironically" because, at the time of sentencing, the Court departed downward based on an overstated criminal history category and imposed a sentence of 240 months. However, at that time, the Court specifically stated that it would not have gone lower than 240 months even if there was no section 851 enhancement and no 20-year mandatory minimum sentence. Thus, there was no prejudice other than some unfortunate surprise to the Petitioner-Defendant regarding the section 851 enhancement. Either way, the Court viewed a 240-month sentence as fair and reasonable under the law.

Petitioner-Defendant also claims that his trial counsel should have raised a number of issues on appeal. There is no support in the record for Petitioner-Defendant's assertion that he instructed his defense counsel to raise additional issue on appeal, given the affidavit of Gary Bryant-Wolf. However, it needs to be said that even assuming for the sake of Petitioner-Defendant's argument that these issues were requested to be raised on appeal, there is no possibility of prejudice because each of the issues were clearly without any merit when the record is reviewed in light of these post-trial assertions by the Petitioner-Defendant.

The Court has reviewed the numerous assertions of Petitioner-Defendant with respect to so-called prosecutorial misconduct. There is no basis to Petitioner-Defendant's claims and there is no basis to allege, in turn, ineffective assistance of counsel, for the failure of Petitioner-Defendant's trial counsel to raise numerous specific grounds of ineffective assistance of counsel. There is no prejudice present in the record before this Court as a result of either the conduct of the prosecutor or the conduct of Petitioner-Defendant's trial counsel. The arguments are without merit. There is no likelihood that

even if the allegations are given any credence by the Court, they had any effect whatsoever on the verdict reached by the jury in this case.

Petitioner-Defendant next asserts that his Sixth Amendment rights were violated because the jury was not called upon to decide the drug quantity. First of all, the law is crystal clear that such claims may not be brought in a section 2255 petition because *Blakely* and *Booker* are not retroactive to cases on collateral review. *Never Misses a Shot v. United States,* 413 F.3d 781, 783-84 (8th Cir. 2005).

As it turns out, the jury was in fact asked to decide drug quantity. The jury made a finding that the amount of drugs is 50 more grams of cocaine base (crack). And, because Petitioner-Defendant was career offender, this drug quantity finding necessitated a base offense level of 37 and a criminal history category of VI, for a Guidelines range of 360 months to life. U.S.S.G. § 4B1.1(b). Moreover, because Petitioner-Defendant had a prior felony drug conviction as to which the government filed sentencing enhancement information, the jury's finding triggered a mandatory minimum penalty of 20 years. 21 U.S.C. §§ 841(b)(1)(A), 851, which was a sentence this Court imposed. There are no Sixth Amendment issues implicated in Petitioner-Defendant's case on the record before the Court. There is little doubt, in the wake of *Booker,* that the Court's sentence of 240 months is consistent with the factors and directives set forth in 18 U.S.C. § 3553. The Court has subjected its sentence to post-*Booker* scrutiny, notwithstanding its conclusion regarding Petitioner-Defendant's motion pursuant to 28 U.S.C. § 2255.

Finally, even assuming that Petitioner-Defendant's apparent self-styled jurisdictional claim is properly before the Court, it is meritless on its face. There is no authority for Petitioner-Defendant's assertion that the nation's drug laws only apply to pharmacists or other regulated persons.

The Court also concludes that an evidentiary hearing is not required in this matter. A 28 U.S.C. § 2255 petition can be dismissed without a hearing if: (1) petitioner's allegations, if accepted as true, would not entitle petitioner to relief; or (2) if the allegations cannot be accepted as true because they are contradicted by the record, are inherently incredible, or are conclusions rather than statements of fact. *Delgado v. United States*, 162 F.3d 981 (8th Cir. 1990). Applying that standard to the allegations of Petitioner-Defendant in this case and the record before the Court, the Court concludes that no evidentiary hearing is required in this case. The assertions of Petitioner-Defendant are entirely belied by the record before this Court. Moreover, the interests of justice will not be served by granting the motions of Petitioner-Defendant.

## CONCLUSION

Based upon the presentations and submissions of the parties, and the Court having again reviewed the contents of the Court's file, and the Court being otherwise duly advised in the premises, the Court hereby enters the following:

## ORDER

1. Petitioner-Defendant Therase Lashown Warren's motion to vacate, set aside, or correct his sentence alleging ineffective assistance of counsel is hereby **DENIED**.

2. Petitioner-Defendant Therase Lashown Warren's motion to vacate his conviction and sentence alleging ineffective assistance of counsel and for violation of his Sixth Amendment rights is **DENIED**.

3. Petitioner-Defendant Therase Lashown Warren's motion request for an evidentiary hearing is **DENIED**.

4. Petitioner-Defendant Therase Lashown Warren's motions filed pursuant to 28 U.S.C. § 2255 are hereby **DISMISSED WITH PREJUDICE**.

Dated: November 14, 2005

s/Donovan W. Frank
DONOVAN W. FRANK
Judge of United States District Court